# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-1831

_____

| | | |
|---|---|---|
| Donald Alholm, | * | |
| | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | Appeals from the United States District |
| | * | Court for the District of Minnesota. |
| American Steamship Company; | * | |
| | * | |
| Defendant - Appellant, | * | |
| | * | |
| The Duluth Clinic, Ltd., a Minnesota | * | |
| corporation; Robert Francis Donley, | * | |
| M.D., | * | |
| | * | |
| Defendants. | * | |

_____

No. 97-1840

_____

| | |
|---|---|
| Donald Alholm, | * |
| | * |
| | * |
| Plaintiff - Appellant, | * |
| | * |
| v. | * |
| | * |
| American Steamship Company; | * |
| The Duluth Clinic, Ltd., a Minnesota | * |
| Corporation; Robert Francis Donley, | * |
| M.D., | * |

Defendants - Appellees.          *
                                 *

_____

Submitted: February 9, 1998
Filed: June 1, 1998

_____

Before FAGG and MURPHY, Circuit Judges, and SMITH,[1] District Judge.

_____

MURPHY, Circuit Judge.

Donald Alholm was injured during docking operations in Duluth, Minnesota and sued his employer, American Steamship Company, under the Jones Act, see 46 U.S.C. § 688, and the providers of his medical treatment, the Duluth Clinic, Ltd. and Dr. Robert Donley, under a negligence theory. The district court[2] granted summary judgment to the medical providers on statute of limitations grounds, but the other claims went to trial. The jury found that both American Steamship and Alholm were negligent, that the negligence caused total damages of $844,000, and that the negligence of American Steamship "legally caused" 75% of the damages. Judgment was entered in Alholm's favor against American Steamship for $633,000. Both parties appeal from that judgment and from the denial of their post trial motions. Alholm also appeals the dismissal of the medical providers. We affirm.

**I.**

_____

[1]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri, sitting by designation.

[2]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

Alholm was injured while working as a deckhand for the ship M/V Sam Laud, which was owned by American Steamship. On arrival in Duluth the ship was docked improperly, and crew members were required to move the docked ship forward. It had been secured by looping inch thick steel cables around spiles, small metal posts on the dock. The ordinary procedure for moving an incorrectly docked ship is for deckhands to attach the ship's front cable to a forward spile, then to detach the other cables from the spiles to which they had been linked, and to pull the ship forward with an onboard winch while crew members walk along side the ship carrying the unattached cables. Once the ship is in the correct place, the cables are fastened to the proper spiles.

On the night of Alholm's injury, May 11, 1992, the bosun departed from customary practice and ordered the deckhands not to detach all the cables from the spiles during the pulling operation. As the ship was moved forward with the winch, it let out length in the non-pulling cables so that their weight was increased. The lengthened cable was very heavy, and Alholm held one in the middle in order to reduce the weight on the loop of the cable and permit a colleague to lift it off its spile. Alholm testified that while he was holding the cable he felt his back straining, "things going," and pain. The pain grew worse over the next few days, and he told his supervisor he had to leave the ship to seek medical attention after the pain forced him to his knee while painting.

Alholm left the ship on May 14, 1992 to obtain treatment at the Duluth Clinic. He was treated there on four occasions, and he returned to work on June 27 even though his back was still sore. He left again on July 5, complaining of back pain and inability to control his right foot. Alholm underwent a magnetic resonance imaging test (M.R.I.) at the clinic on July 7 which revealed a lipoma, a non cancerous fatty tumor. Dr. Donley examined him, determined that the lipoma had been aggravated by his strained back, and recommended surgery to remove the lipoma.

Dr. Donley performed the surgery on September 8, 1992. In spite of the fact that one of the known risks was bleeding which could form an epidural hematoma that would compress and damage the spine, Dr. Donley did not advise Alholm to stop taking medication that limits blood coagulation and did not order blood tests which would have revealed any coagulation problems. Dr. Donley also did not consult the M.R.I. results prior to surgery; they would have revealed that Alholm had an extra vertebra. Dr. Donley entered Alholm's back at the wrong place and had to make another incision at a lower vertebra. Severe bleeding ensued, and Alholm was taken to neurological intensive care.

Early in the morning after the surgery Alholm suffered severe pain and was unable to move his foot. When Dr. Donley was informed about these complications later in the morning of September 9, he rushed Alholm back into surgery and found a hematoma compressing the spine, distortion of the spinal cord, and nerve damage. His attempt to alleviate the pressure caused further damage to Alholm's spinal cord. Alholm now suffers from partial paralysis of his lower extremities, problems with bowel and bladder control, and has no erection function.

Alholm sued American Steamship under the Jones Act, claiming that the company's negligence caused his injury, and also asserted a negligence cause of action against the medical providers for their treatment. He sent a summons and copy of his complaint to the clinic and the doctor by certified mail, return receipt requested, along with an acknowledgment form. The mailing did not include the notice or request for waiver required by Fed. R. Civ. P. 4(d)(2)(D)-(G). An employee of the clinic signed the certified mail receipt on September 2, 1994, but on advice of counsel the acknowledgment forms were not signed and returned. The medical providers ultimately consented to service on November 23, 1994, over two years after the surgery. The district court subsequently granted summary judgment to the medical providers on the basis that the statute of limitations had run before Alholm had perfected service.

The remaining parties proceeded to trial, and the jury determined that American Steamship and Alholm were both at fault and that Alholm had suffered $844,000 in damages, 25% of which were legally caused by Alholm's own negligence and 75% by American Steamship's negligence. The jury was not asked to determine whether the medical providers were legally at fault, but after it reached a verdict on liability it was given a supplemental interrogatory which asked to what extent Alholm's injuries were a result of his treatment, as opposed to the injury on the docks. The jury answered that 20% of the injuries resulted from the incident at the docks and 80% from his medical care.

Both parties who had been found negligent raised objections. Alholm moved for judgment as a matter of law under Fed. R. Civ. P. 50, arguing that his negligence should not have been submitted to the jury. American Steamship moved for judgment in its favor at the close of the evidence and again after trial on the basis that Alholm had not presented evidence clearly showing his injuries were caused by pulling the ship's cable and that it should not be liable for damages suffered because of his medical treatment. American Steamship also made a motion for a new trial under Fed. R. Civ. P. 59 based on the plaintiff's closing argument. The district court denied all the motions and entered an order holding American Steamship liable for $633,000, or 75% of the total damages. Judgment was entered in that amount.

On appeal American Steamship renews its claim that there was insufficient evidence to show it was responsible for Alholm's injuries, asserting that he only presented speculative evidence that his need for surgery resulted from the docking incident. It also argues that it should not be held responsible for more than $120,000 in damages because 80% of Alholm's injuries were found to have resulted from his medical treatment and that plaintiff's closing argument deprived it of a fair trial. Alholm replies that his evidence met the Jones Act requirement to show the employer's negligence contributed to the injury, that under the Act an employer is responsible for

all subsequent damages that arise from a negligently inflicted injury, and that a new trial is not warranted.

Alholm argues that his damages should not have been reduced for contributory fault because he was following orders at the time he was injured and there was no safe alternative to what he did. Alholm also appeals the grant of summary judgment to the medical providers, claiming that he fulfilled the requirements for personal service of process under Minn. R. Civ. P. 4.03 because the medical providers were "actually served" as shown by their affidavits acknowledging that they had received the summons and compliant before the statute of limitations ran. He says that even if his service was deficient, there is a question of fact about whether the statute continued to run until September 9, 1995 because of his continuous treatment for one year after surgery. The medical providers reply that Alholm did not comply with the requirements for service of process before November 23, 1994, the date when they consented to service, and that the single act exception to the continuous medical treatment rule applies so that the limitations period closed on September 9, 1994.

## II.

Minnesota law governs Alholm's medical malpractice claims against Dr. Donley and the clinic so the state statute of limitations and commencement rules apply. See Anderson v. Unisys Corp., 47 F.3d 302, 309 (8th Cir. 1995); Appletree Square I, Ltd. v. W.R. Grace & Co., 29 F.3d 1283, 1286 (8th Cir. 1994). Minnesota has a two year statute of limitations for medical malpractice claims, see Minn. Stat. § 541.07, and the state procedural rule provides that an action commences "(a) when the summons is served . . ., or (b) at the date of acknowledgment of service if service is made by mail." Minn. R. Civ. P. 3.01.

Alholm claims he personally served the medical providers in compliance with Minn. R. Civ. P. 4.03(a) by sending his summons and complaint by certified mail and

receiving a return receipt, and that the defendants received timely "actual notice" as shown by affidavits admitting they had received the materials. He also claims that he effected service under Fed. R. Civ. P. 4(e)(2) (individuals) and 4(h)(1) (corporations) because the mailing caused an individual in the clinic to "deliver" summons to the defendants. Minn. R. Civ. P. 4.03(a) provides that a summons is to be served on an individual by "leaving a copy at the individual's usual place of abode with some person of suitable age and discretion then residing therein."[3] Service on a corporation is accomplished by delivering a copy of the complaint to an officer, managing agent, or any other agent expressly or impliedly designated to receive service. See Minn. R. Civ. P. 4.03(c).[4] Alholm failed to comply with the rules applicable to either Dr. Donley or the clinic. He attempted to serve the doctor at his place of business rather than his home. He also submitted no evidence that the individual who signed the return mail receipt was of suitable age, and it cannot be presumed that the individual was qualified to receive or "deliver" service. Cf. Direct Mail Specialists, Inc. v. Eclat Computerized Technologies, Inc., 840 F.2d 685, 688-89 (9th Cir. 1988) (record showed exact person who accepted process personally from server, and she had "more than minimal

---

[3]Fed. R. Civ. P. 4(e)(2) is materially identical, allowing service to be effected by: delivering a copy of the summons and of the complaint to the individual personally or by leaving copies thereof at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.

[4]The federal rules provide that a corporation may be served by:

delivering a copy of the summons and of the complaint to an officer, a managing agent or general agent . . . .

Fed. R. Civ. P. 4(h)(1).

responsibility" at the company).  Because these attempts at service did not comport with the rules, service cannot be deemed effected until November 23, 1994, when the medical providers consented to service.

The Minnesota statute provides that the limitations period runs for two years from the date of accrual, see Minn. Stat. § 541.07, and Alholm contends that the statute did not begin to run until September 9, 1993, or one year after his operation.  The medical providers claim the statute began to run on the date of his surgery.  A malpractice action accrues when the alleged negligence and resulting damage occur.  See Offerdahl v. University of Minnesota Hosp. and Clinics, 426 N.W.2d 425, 428-29 (Minn. 1988). If the malpractice stems from a continued course of treatment, the statute begins to run at the end of treatment.  See Offerdahl, 436 N.W.2d at 427 (citing Schmitt v. Esser, 226 N.W. 196, 197 (Minn. 1929)).  An exception to the continued course of treatment rule exists when "the alleged malpractice consists of a single act which is complete at a precise time, which no continued course of treatment can cure or relieve, and where the plaintiff is actually aware of the facts upon which the claim is based."  Gulley, 886 F.2d at 163; see also Offerdahl, 425 N.W.2d at 428-29.  The evidence here showed that Alholm was aware of the facts on which his claim was based at the time of his second surgery.  The second procedure was undertaken under emergency circumstances, and he suffered from paralysis and other complications afterwards.  This was sufficient to show actual knowledge of the facts that gave rise to the claim.

Alholm claims that he was not aware of the facts underlying his claim until one year after the second surgery because he believed the complications during that year were ordinary consequences of surgery and he was told more recovery time was necessary.  Where the malpractice occurs in a single act, however, "subsequent time and effort to merely remedy or cure that act could not toll the running of the statute" Gulley, 886 F.2d at 163 (quoting Schmitt, 226 N.W. at 197).  As long as the plaintiff knew the facts that gave rise to his claim, ignorance of the existence of a cause of action does not make the single act exception inapplicable, "nor is it necessary that the

ultimate damage be known or predictable so long as some damage has occurred." Gully, 886 F.2d at 163 (quoting Goellner v. Butler, 836 F.2d 426, 430-31 (8th Cir. 1988)). In this case the key facts giving rise to the claim occurred in connection with the first and second surgeries when Alholm's cause of action accrued.

Lastly, Alholm argues that the district court abused its discretion by hearing the summary judgment motion before the discovery cutoff date of September 3, 1995. See Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1441-42 (5th Cir. 1993). After the hearing on April 26, the court closed the record applicable to the motion which meant the affidavit of Dr. Todd Helle dated June 2, 1995 was never made part of the record considered on the motion. In this affidavit Dr. Helle stated that the period of curative treatment for Alholm's surgery lasted for one year, the time necessary to rehabilitate him and to determine whether the complications from surgery were temporary. Alholm claims the affidavit would have created an issue of material fact on whether the continuous treatment rule should apply.

A defendant may move for summary judgment "at any time," and the rules do not require that discovery be completed before the motion is heard. See Fed. R. Civ. P. 56(b), (c). A continuance may be in order if the party opposing the motion submits an affidavit showing that it needs more time to present its opposition. See Fed. R. Civ. P. 56(f); see also Krim, 989 F.2d at 1441. Alholm did not seek a continuance, however, nor has he identified any attempt to show that he needed more time to acquire this affidavit of Dr. Helle. Other affidavits of Dr. Helle appear in the summary judgment motion record which suggests Alholm had ample opportunity to obtain this type of information prior to the hearing on the motion. He cannot now succeed with the argument that he should have been given more time to gather evidence to support his claim, and his reliance on De Rogatis v. Mayo Clinic, 1997 WL 11543 (June 1, 1987 D. Minn.), is misplaced because there the court specifically ordered the parties to submit additional affidavits on the completion of treatment. Moreover, Dr. Helle's affidavit would not have created an issue of material fact on whether Alholm was aware

of the facts underlying his complaint because there is no dispute he knew of the need for emergency surgery and of the complications he was experiencing.  See, Gulley, 886 F.2d at 163.  The malpractice, if any, was connected with the surgery, and any continuing treatment was not part of the alleged malpractice.  See id.  It was therefore not an abuse of discretion for the district court to refuse to consider the affidavit.

Summary judgment in favor of the medical providers was appropriate because Alholm's claim against the medical providers began to run on the date of the second surgery (September 9, 1992), and the limitations period expired in September 1994 before the medical providers admitted service in November.

## III.

Each side now seeks modification of the judgment in its favor.

## A.

American Steamship asserts that it was entitled to judgment as a matter of law because there was insufficient evidence that its fault caused Alholm's injuries. It does not contest the finding that it was negligent during the docking operation, but claims that the cable pulling work did not cause all Alholm's problems because his back injury had resolved itself before he returned to work on June 24, 1992. It says he only presented speculative testimony by Dr. Donley that he suffered injury from the cable pulling which required him to leave the ship again on July 7 and to undergo surgery. Alholm replies that he presented evidence to show that the work injury changed the way his lipoma interacted with the spine, thus causing the symptoms that made surgery necessary.

We review the denial of a motion for judgment as a matter of law de novo. See Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir 1996). In Jones Act cases the verdict must stand if "the proofs justify with reason, the conclusion that employer negligence played any part, even the slightest, in producing the injury or death. . . ." Ferguson v. Moore-McCormack Lines, Inc., 352 U.S. 521, 523 (1957) (quoting Rogers v. Missouri Pac. R.R. Co., 352 U.S. 500, 506 (1956)); see also Toucet v. Maritime Overseas Corp., 991 F.2d 5, 10 (1st Cir. 1993) (burden on causation is "featherweight"); Lies v. Farrell Lines, Inc., 641 F.2d 765, 770-71 (9th Cir. 1981). There was evidence at trial to show that the cable pulling caused Alholm's lipoma to change position, precipitating his symptoms. Dr. Donley stated that to a reasonable degree of medical probability the symptoms requiring surgery "related to a tumor as well as to the mechanical problem that precipitated his symptoms when he was pulling a cable on the steamship." He testified that the

-11-

pulling irritated the tumor and nerves and that the work changed the way the tumor related to the "spinal processes." During the pulling, "with that stress and strain, he was distending the veins and compressing the nerves together around the tumor," causing the symptoms that required surgery. It was also noted in the medical records that the lipoma was aggravated by Alholm's back strain. This amounted to "a sufficient showing (i.e. more than a possibility) that a causal relationship existed" between American Steamship's negligence and the need for surgery. <u>Mayhew v. Bell S.S. Co.</u>, 917 F.2d 961, 963 (6th Cir. 1990) (emphasis removed) (quoting <u>Moody v. Maine Central R. Co.</u>, 823 F.2d 693, 695 (1st Cir. 1987)).

In support of its argument that Alholm's injury had healed when he returned to work and that there was insufficient evidence to conclude that the cable incident rather than the normal progression of the lipoma caused the need for surgery, American Steamship cites a medical record from the Duluth Clinic written on June 24. This was after the incident but before Alholm returned to work, and the record indicated that he no longer exhibited symptoms. American Steamship also points to Alholm's testimony that he would not have been allowed to return to work unless he had a fit for duty card. This evidence is certainly part of the record, but there was other evidence from which the jury could find that the injury persisted and played a role in Alholm's continuing physical problems. Alholm testified on direct that he was still experiencing pain when he went back to the ship and on cross examination that he experienced pain after he returned. It was for the jury to resolve the factual conflicts, and there was sufficient evidence on which to base its findings on causation.

## B.

Alholm contends that because he was following orders the jury should not have been permitted to find him comparatively negligent or to consider whether there was a safe alternative course of action at the time of the dock incident. He

argues that seamen cannot be comparatively negligent when following orders, citing Burden v. Evansville Materials, Inc., 840 F.2d 343 (6th Cir. 1988) and Hall v. American S.S. Co., 688 F.2d 1062, 1065-66 (6th Cir. 1982) (no assumption of risk where seaman is following orders). The cited cases do not establish a blanket rule precluding a seaman from being found contributorily negligent when acting at the direction of a supervisor. See id. The negligence of the worker and the possibility of a safe alternative may be considered when a seaman is ordered to do a task but is not instructed on the method to use and he acts negligently despite the availability of an alternative. See Burden, 840 F.2d at 346-48. A seaman cannot be found comparatively negligent, however, when following an order to complete a task in a specific manner. Cf. Burden, 840 F.2d at 346-47 (6th Cir. 1988) (plaintiff comparatively negligent where he followed order to complete task but was negligent in failing to use a known safe technique); Tolar v. Kinsman Marine Transit Co., 618 F.2d 1193, 1196 (6th Cir. 1980) (no comparative negligence where seaman completed task in only way possible).

The court properly instructed the jury on the law. The jury was told that if Alholm had been ordered to handle the cable in a particular fashion and he acted as ordered, it could not consider contributory negligence. If, on the other hand, he had been directed to move the lines but not ordered to use a particular method, the jury could consider whether he chose a less safe alternative that contributed to his injury. The evidence at trial could support either type of finding, depending on the interpretation of testimony, and such factual questions are for the jury to determine. Alholm testified that "the bosun said I were [sic] going to have to wait for Fast Eddie to come back to help me get this cable off the spoil [sic]." When Alholm was asked whether he had "ever done it like that before," he responded that "what I have to do, or one of us has to do, one has to get here in the eye, and one's going to have to get here in the middle . . . ." Alholm also answered that he was doing what he had been ordered to do in response to a leading question on redirect examination. It is unclear from this testimony whether the bosun told Alholm to get in the middle

or whether Alholm decided how to complete the task.  The jury could have found on this record that Alholm chose the way to do the job and that he could have asked for assistance, or it could have found that he was following the bosun's order.  For this reason the question of Alholm's negligence was properly presented to the jury, and there was sufficient evidence to support its finding.

Alholm also contends that American Steamship's comparative negligence defense was based only on his credibility and that this is an insufficient basis to sustain finding of fault on his part.  See Birchem v. Burlington N. R.R. Co., 812 F.2d 1047, 1049 (8th Cir. 1987); Borough v. Duluth, Missabe & Iron Range Ry. Co., 762 F.2d 66, 69 (8th Cir. 1985).  American Steamship's defense was not solely based on credibility, however.  It simply asked the jury to interpret ambiguous testimony in its favor, and this was not improper.

## C.

American Steamship argues that the judgment unfairly required it to compensate Alholm for more of his injuries than warranted by the jury findings and that it should only be liable for $ 126,000.  It asserts that the judgment effectively made it jointly and severally liable for all of Alholm's injuries not caused by his own negligence, even though the jury found only 20% of his injuries resulted from the docking incident, as opposed to 80% from his medical treatment.  American Steamship says that a shipowner is not vicariously liable for the negligence of a physician who is not its agent, citing Joiner v. Diamond M. Drilling Co., 688 F.2d 256, 262 (5th Cir. 1982), and that comparative negligence principles should have been applied to make it liable only for a portion of the damage award.  It points out that comparative negligence has been discussed favorably by the Supreme Court, citing McDermot v. AmClyde, 511 U.S. 202 (1994), United States v. Reliable Transfer, 421 U.S. 397 (1975), and in state tort decisions.  Alholm responds that under the Jones Act an employer is responsible for all consequences of medical care

made necessary by its negligence, including medical malpractice during treatment of injuries.

American Steamship's argument about the judgment overlooks the nature of the jury's findings. We have reviewed the special verdicts returned by the jury, the court's instructions to the jury, and the relevant sections of the transcript. No question of fault of the medical providers or of whether medical malpractice caused Alholm's injuries was presented to the jury. The jury was asked to consider fault and legal cause for only Alholm and American Steamship.[5] The jury was also

---

[5]The liability questions were submitted to the jury on a special verdict form which read:

> 1.      Do you find from a preponderance of the evidence that the Defendant was negligent in the matter claimed by the Plaintiff and that such negligence was a cause of damage to the Plaintiff?
>
>          Answer:                Yes.
>
>                            *    *    *
>
> 2.      Do you find from a preponderance of the evidence that the Plaintiff himself was negligent in the manner claimed by the Defendant and that such negligence was a cause of Plaintiff's own damage?
>
>          Answer:                Yes.
>
>                            *    *    *
>
> 3.      What proportion or percentage of Plaintiff's damage do you find from a preponderance of the evidence to have been legally caused by the negligence of the respective parties?
>
>          Answer in terms of percentages
>
>                 The Defendant          75%
>                 The Plaintiff          25%
>
> 4.      What sum of money do you find from a preponderance of the

-15-

instructed that if it found American Steamship negligent, it would be liable for any additional injuries inflicted by a medical care provider during treatment, "whether the intervening agency acts prudently or negligently." This was a correct statement of the controlling law.

Where a negligent tortfeasor is responsible for an injury requiring subsequent medical care, that party normally is liable for an injury during treatment of the victim. See Restatement (Second) of Torts, § 457. This rule applies to cases arising under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51, which provides recovery to railroad workers injured because of employer negligence. See Heater v.

---

> evidence to be the total amount of Plaintiff's damages (without adjustment by application of any percentages you may have given in answer to Question 3)?
>
> > Answer in Dollars          $844,000.
>
> ----------------------------------------------------------------

After the special verdict was completed by the jury, an additional question was submitted by a supplemental or second special verdict which merely asked what percentage of Alholm's injuries resulted from the docking incident as opposed to his medical care:

> You found that the plaintiff is entitled to recover a sum as a result of his injuries. You must now make a second decision. Please apportion the extent of his injuries, between the injury you find he sustained on the LTV docks and any injury he sustained as a result of his subsequent medical care. Your decision must be on a percentage basis, and the percentages must equal 100%.
>
> > LTV Dock                      20%
> > Subsequent Medical Care 80%.

There was no question about the fault or negligence of the absent medical providers and no finding of liability.

-16-

Chesapeake and Ohio Ry. Co., 497 F.2d 1243, 1246-47 (7th Cir. 1947); Denver & Rio Grande W. R.R. Co. v. Conley, 293 F.2d 612, 613 (10th Cir. 1961); Kansas City S. Ry. Co. v. Justis, 232 F.2d 267, 272 (5th Cir. 1956). The rule also applies to the Jones Act, which incorporates FELA by expressly granting seamen rights arising under "all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees." 46 U.S.C. § 688; see De Zon v. American President Lines, 318 U.S. 660, 665 (1943); Lies, 641 F.2d at 770-71. American Steamship relies on Kossick v. United Fruit Co., 365 U.S. 731 (1961); The C.S. Holmes, 209 F. 970, 975 (W.D. Wash. 1913); and Socony-Vacuum Oil CO. v. Premeaux, 187 S.W. 2d 690, 695 (Tex. Civ. App. 1945), aff'd in part, rev'd in part, 192 S.W.2d 138 (Tex. 1946). The rule of those cases, however is that a shipowner who is not responsible for the initial injury cannot be held vicariously liable for the negligence of an independent physician. This case is different because the jury found that American Steamship's negligence caused Alholm's initial injury. His damages flowed from that negligence under the applicable law reflected in the jury instructions. The company may therefore be held liable for the proportion of Alholm's injuries occurring during treatment. See Heater, 497 F.2d at 1247; Kansas City S., 232 F.2d at 272.

American Steamship argues that it should not be penalized for Alholm's failure to make proper and timely service that prevented trial of the liability issues against the medical providers. The company could have timely filed a cross complaint against the medical providers, however, or attempted to join them itself. Such procedures are the appropriate means to allocate payment of damages where there is a missing tortfeasor. See Ebanks v. Great Lakes Dredge & Dock Co., 688 F.2d 716, 719 (11th Cir. 1982). Some responsibility for the absence of the medical providers belongs to American Steamship. Under the circumstances and established law, it is appropriate to hold the company liable for the total amount of damages not attributable to Alholm.

-17-

## IV.

American Steamship claims it is entitled to a new trial because of plaintiff's closing argument. It claims that Alholm's counsel personally vouched for the credibility of his client, appealed to the local prejudices of the jury, and made an ad hominem attack on defense counsel. At the end of plaintiff's argument American Steamship moved for a mistrial on the grounds that it contained prejudicial comments and would unfairly influence the jury. The district court denied that motion, as well as its post trial motion for a new trial. Our review is for abuse of discretion. See Vastike v. Union Pac. R.R. Co., 725 F.2d 1146, 1149 (8th Cir. 1984). A new trial should be granted where the improper conduct of counsel in closing argument "causes prejudice to the opposing party and unfairly influences a jury's verdict." Pappas v. Middle Earth Condominium Ass'n, 963 F.2d 534, 540 (2d Cir. 1992). The district court has wide discretion in such matters, see Vastike, 725 F.2d at 1149, however, and its superior vantage point requires deference unless the statements were "plainly unwarranted and clearly injurious." Id.

American Steamship says that counsel personally vouched for the credibility of Alholm and used derogatory names, citing Polansky v. CNA Ins. Co., 852 F.2d 626, 628 (1st Cir. 1988); Draper v. Airco, Inc., 580 F.2d 91, 95-97 (3d Cir. 1978); Model Rules of Professional Conduct 3.4(e). When defense counsel raised an objection to what he perceived as bolstering comments, the court immediately interrupted plaintiff's counsel and cautioned that he should "continue, unrestrained a little bit." The court thus took corrective action on its own, and American Steamship did not request any instruction. Defense counsel had previously questioned Alholm about his failure to call witnesses about the cable pulling incident, and made several comments about it. The closing argument responded to this line of questioning, and any prejudice was minimized by an appeal to the jurors to decide Alholm's credibility themselves. American Steamship also objects to references to it as "a gang of bullies" and its counsel as a "spin doctor." While we

-18-

do not approve of such name calling, the district court sustained an objection to one reference and instructed the jury to disregard the other. This was sufficient to prevent undue prejudice to American Steamship in the entire context of the arguments.

Other statements which are cited as grounds for a new trial were not objected to at trial. See West v. Carson, 49 F.3d 433, 435-36 (8th Cir. 1995). Cf. Pappas, 963 F.2d at 539 (review for abuse of discretion where counsel made prompt objections); Polansky, 852 F.2d at 628 (no reversal where there is no timely objection). The record suggests that defense counsel initially raised the issue of plaintiff's home town status, entitling his counsel to respond. It was therefore not plain error for the district court to allow comment, and the remarks did not rise to a level requiring reversal. Cf. Pappas, 963 F.2d at 539-40; Westbrook v. General Tire & Rubber Co., 754 F.2d 1233, 1238 (5th Cir. 1985). Counsel's rhetorical questions are said to have implied that American Steamship had misrepresented Dr. Donley's testimony and the medical evidence. While perhaps poorly phrased, the statements reflected an opposing interpretation of Dr. Donley's testimony, and it was not plain error for the court to allow counsel to continue his argument. See West, 49 F.3d at 435. Additionally, any suggestion that American Steamship withheld evidence of a "light duty slip" would not require a new trial because the issue was raised on cross examination and the jury had a full opportunity to hear evidence from both sides which it could evaluate.

Finally, the trial court instructed the jury that:

the lawyers' arguments, all the way through, have consistently not been evidence, unless the lawyers made an agreement or stipulated to the fact. You heard in this case, particularly during closing arguments, each of the lawyers get a little exercised. They got excited. That is not unnatural. This is a case of concern for both sides, and the lawyers from time to time will then need to get a little more expansive than they

-19-

might otherwise be inclined to do. You'll disregard that. Those are kinds of appeals either to their own biases or to yours. Okay. Set those aside. They're not part of the case. And they're entitled to get a little feisty once in a while, and that happens.

TR. III, p. 64-65. This instruction effectively neutralized any prejudicial impact.

## VI.

This was a hard fought trial, and the jury was asked to resolve competing issues of fact. Its findings were supported by the evidence, and the judgment reflected a correct application of the governing law. The district court did not err by dismissing the medical providers because of the running of the statute of limitations before proper service, and in light of the few objections and the cautionary instructions to the jury, the closing arguments do not require a new trial. We therefore affirm the judgment of the district court in all respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.